IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BRIAN POPHAM,

    Plaintiff,

      v.

COBB COUNTY SCHOOL
DISTRICT,

    Defendant.

CIVIL ACTION FILE
NO. 1:10-CV-2174-TWT

## OPINION AND ORDER

The Plaintiff in this case was a school bus driver for the Cobb County School District who claims that he was terminated for speaking out at public school board meetings. However, the Plaintiff is unable to show that the school district's board of education violated his rights explicitly or pursuant to a custom or policy of rubber stamping subordinate decisions.

## I.  Introduction

Defendant Cobb County School District ("CCSD" or the "District") is the body that provides public education to the children of Cobb County, Georgia.  CCSD utilizes 1,100 buses and employs 800 drivers to provide the daily transportation needs of its students.  The Plaintiff, Brian Popham, worked as a school bus driver for the

District from November 28, 2005 through October 22, 2009, when he was terminated. (See Pl.'s Statement of Facts in Opp'n to Def.'s Mot. for Summ. J., ¶¶ 1-3, 5).

The transportation department within CCSD drew public attention during the time period at issue.  A Cobb County grand jury was convened in January 2010 to investigate allegations by bus drivers and mechanics concerning mismanagement, management through fear, and safety infractions.  (See Abraham Dep. Ex. 10, at 9).[1]  The grand jury found that the District's bus fleet was extremely old and that there was no plan for obtaining new buses.  The jury further found that bus maintenance records were in shambles, that there were no written procedures for mechanics, and that eight of the fourteen lifts used in bus maintenance were unsafe.  (Id. at 9-12).  The grand jury's investigation noted that "the drivers and mechanics work in an environment of intimidation and 'virtual fear' of losing their jobs – it is palpable and we heard and saw it time and again."  (Id. at 14).  The grand jury stated that transportation employees "have no faith in that chain of command."  (Id.)  The investigation concluded by calling for "[a]n audit of Human Resources practice of

---

[1] The Defendant objects to the admissibility of the grand jury report and to the admissibility of various newspaper articles that the Plaintiff cites in his statement of material facts, as well as the result of Georgia Department of Labor determinations on unemployment benefits.  Because the Court ultimately concludes that the Plaintiff cannot establish municipal liability even with this evidence, the Court need not resolve the Defendant's objections.  Of course, the Plaintiff had been fired months before the grand jury was convened.

hiring and firing both Fleet Maintenance Mechanics and Bus Drivers to assure fair and equal treatment.  In addition, an audit should be performed to assure all requirements of the [employee handbook] concerning employee relations, employee evaluations, notifications of deficient performance, hiring and firing practices, etc. are strictly followed."  (Id.)

Plaintiff Brian Popham was the spokesperson for the Cobb County Association of Pupil Transportation, and he often spoke at CCSD Board of Education (the "Board") meetings.  At the May 28, 2009 Board meeting, Popham talked about how the District's buses were almost 20 years old and how mechanics were being overworked.  Popham also criticized the CCSD's cutting of costs.  Popham reiterated his concerns at the June 3, 2009 Board meeting.  At that meeting, he also criticized the Board's lack of transparency and the Superintendent's salary.  He stated that "many more Cobb employees wanted to protest but feared retaliation."  (Pl.'s Statement of Facts in Opp'n to Def.'s Mot. for Summ. J., at ¶¶ 151-156).

Popham's criticism in May 2009 occurred around the same time as other public criticism of the District's transportation department.  On May 7, 2009, the Marietta Daily Journal noted parents' complaints about the radio system installed in many district buses.  Similarly, a Georgia Department of Public Safety inspection of CCSD buses revealed 1,069 buses with defects and 115 buses with serious defects.  (See

Abraham Dep. Ex. 10, at 10).  The Plaintiff argues that this attention led Rick Grisham, the District's director of transportation, to institute policies seeking to prevent a public outcry.  (Pl.'s Statement of Facts in Opp'n to Def.'s Mot. for Summ. J., at ¶¶ 157-180).

For various reasons, the District had a policy prohibiting drivers from parking school buses in single-business parking lots.  On September 9, 2009, Grisham allegedly witnessed Popham park his bus at the Rite-Aid parking lot on Stilesboro Road.  Popham claims to have parked there frequently in the past.  Later that month, at a Cobb County Association of Pupil Transportation meeting with Grisham, Grisham refused to speak with Popham about parking at the Rite-Aid, saying the issue was "personal."  (Id. at ¶ 184).  Popham claims that Grisham and Grisham's staff warned Popham not to go to the media about the bus parking issue.  (Id. at ¶¶ 184-190).

On October 18, 2009, Popham again parked at the Rite-Aid on Stilesboro Road. Grisham learned that the bus was parked there and drove to the Rite-Aid to investigate.  He found Popham sitting in his bus with his head down on the steering wheel as if he were asleep.  Grisham asked Popham to move the bus and Popham did so.  Grisham then referred the matter to the human resources department ("HR") and referenced Popham's threat to take the parking issue to the media.  (Rowe Dep. at 133, 144; Ex. 3).  After investigation, HR recommended that Popham be terminated for

parking his bus at a Rite-Aid without permission and for violating CCSD policy prohibiting parking at single-business parking lots.  (See Def.'s Statement of Material Facts, Ex. AA).  Popham claims that numerous other bus drivers have parked at the Rite-Aid lot and have not been disciplined for it.

Popham further contends that HR added additional reasons for his termination after the recommendation was made.  The additional reasons given for Popham's termination were an alleged time card falsification in January 2009 and an alleged late arrival to work in April 2009.  Popham was also cited for failing to comply with bus VCR tape procedures.  Bus drivers are required to rotate several tapes through their VCR and ensure the tapes are recording.  Popham argues that his supervisor Peggy Baxter had inspected the VCR and concluded that it was not working, contrary to the findings in his termination letter.  Popham also claims that he was given a negative performance evaluation post-termination despite a May 2009 evaluation that marked him as a dedicated and committed driver.  The Georgia Department of Labor found that Popham's termination was not "for cause" and ruled that Popham was eligible for disability benefits.  (Pl.'s Statement of Facts in Opp'n to Def.'s Mot. for Summ. J., at ¶¶ 203-215; Def.'s Statement of Material Facts in Supp. of Def.'s Mot. for Summ. J., Ex. AA).

In general, the CCSD Board must approve the termination of any bus driver. (Finlayson Dep. at 153).  When it receives a recommendation to terminate an employee, the Board holds a closed-door "executive session" with the Board members, the superintendent, the chief human resources officer, and the District's attorney.  (Dunnigan Dep. at 55-58).  At the executive session, each Board member would receive a report generated by human resources listing the reasons why human resources felt the employee should be terminated.  (Id. at 50-53).  During the meeting, the chief human resources officer would walk the Board through the report and discuss any questions the Board had, and the Board would often engage in a discussion about the recommendation.  (Bartlett Dep. at 33-34).  When the Board approved the recommendation to terminate the Plaintiff in this case, it was comprised of John Abraham (the chairman), David Banks, Alison Bartlett, Holli Cash, John Crooks, Lynnda Crowder-Eagle, and David Morgan.  Popham argues that his termination violated his rights under the First Amendment, and seeks to vindicate those rights under 42 U.S.C. § 1983.

## II.  Motion for Summary Judgment Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).  The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

### III.  Discussion

#### A.    CCSD's Liability Under Monell

The Defendant argues that the Plaintiff is unable to hold CCSD liable under the standard set forth in Monell v. Department of Social Services, 436 U.S. 658 (1978).  "[M]unicipalities may not be held liable for constitutional deprivations on the theory of respondeat superior."  Doe v. School Board of Broward County, Florida, 604 F.3d 1248, 1263 (11th Cir. 2010).  "A municipality may be held liable 'only if such constitutional torts result from an official government policy, the actions of an official fairly deemed to represent government policy, or a custom or practice so pervasive and well-settled that it assumes the force of law.'"  Id. (quoting Denno v. School Board of Volusia County, Fla., 218 F.3d 1267, 1276 (11th Cir. 2000)).  "In addition to identifying conduct attributable to the municipality, a plaintiff alleging municipal

liability under § 1983 must show that 'the municipal action was taken with the requisite degree of culpability, i.e., that the municipal action was taken with deliberate indifference to its known or obvious consequences.'" Id. (quoting Davis v. DeKalb County Sch. Dist., 233 F.3d 1367, 1375-76 (11th Cir. 2000)).  Further, "Monell's policy or custom requirement [] preclude[s] § 1983 liability for a subordinate official's decisions when the final policymaker delegates decisionmaking discretion to the subordinate, but retains the power to review the exercise of that discretion." Id. at 1264 (quoting Scala v. City of Winter Park, 116 F.3d 1396, 1399 (11th Cir. 1997)).

"Determining the persons or bodies that have final policymaking authority for the defendant is a matter of state law." Id. at 1264.  The parties agree that, under Georgia law, the CCSD Board holds final policymaking authority for the CCSD.  The Plaintiff contends that his termination was the result of: (1) a pervasive custom or practice by which the Board failed to provide meaningful review of termination recommendations which allowed CCSD to develop a custom and practice of unconstitutional retaliation leading to the Plaintiff's termination; and (2) the actions of a final policymaker, because the Board, as final policymaker, approved the recommendation to terminate the Plaintiff.  (See Def.'s Br. in Supp. of Def.'s Mot. for Summ. J., at 27).

The Defendant argues that the Board provides a sufficient level of review of termination recommendations such that there is not a custom or practice within CCSD of rubber stamping termination recommendations. Therefore, any retaliatory motivation of subordinate employees, such as Transportation Director Rick Grisham, is not attributed to the District. The Defendant further argues that the Plaintiff has not shown any evidence of a policy or custom which could lead to municipal liability and that the Plaintiff must therefore establish that the Board sanctioned the violation of the Plaintiff's rights, which the Plaintiff cannot do.

The Plaintiff is unable to show that the Board had a custom or policy of rubber stamping termination recommendations. "A municipality's failure to correct the constitutionally offensive actions of its [transportation] department may rise to the level of a 'custom or policy' if the municipality tacitly authorizes these actions or displays deliberate indifference towards the" offensive actions. Brooks v. Scheib, 813 F.2d 1191, 1193 (11th Cir. 1987). Here, the evidence shows that the Board did not tacitly authorize retaliatory terminations and did not display indifference to termination recommendations in general or to the concern that employees were being retaliated against. Instead, the evidence indicates that the Board sufficiently considered termination recommendations and that the Board was concerned about retaliatory terminations.

While Board member Crowder-Eagle testified that she considered it unethical for the Board itself to independently investigate personnel recommendations from the Superintendent, she also stated that the Board could vote against the Superintendent's decision and that she had personally not supported a recommendation in the past. (Crowder-Eagle Dep. at 58-59).  Board member John Abraham specifically recalls discussing whether employees were being terminated for speaking out and sought reassurances from HR that the termination recommendations were not based on reprisals for public speaking.  (See Abraham Dep. at 39-40).  Although Abraham and the Board did not conduct their own investigation, Abraham's testimony supports the conclusion that the Board was concerned about retaliatory terminations.  (See Abraham Dep. at 40-41 (noting that the Board had concerns about retaliation); id. at 42 ("There have been a number of cases I can recall … a couple of people that I wanted clarification, wait a minute, the person just said this and you're going to fire this person? … So.  We would look at these very carefully for the most part. Everybody would.").  Indeed, Abraham testified that he "remember[ed] the issue in general of retaliation… and [] brought that to the superintendent to address."  (Id. at 53).

Likewise, the fact that Board member Alison Bartlett admits that she did not have a way to learn the motivation behind termination recommendations does not

mean the Board merely rubber stamped termination decisions.  (Bartlett Dep. at 38-39).   Indeed, Bartlett stated the Board could ask questions about termination recommendations and their supporting investigations.  (Id. at 30-31).  Bartlett even asked District management during one executive session whether employees were being targeted for speaking out.  (Id. at 35).  Bartlett specifically recalls having a discussion of the recommendation to terminate Popham during the executive session in advance of the open meeting where the Board approved the recommendation.  (Id. at 34).  According to Bartlett, Popham had not followed "the rules" and "by not following the rules [human resources] had a right to terminate him."  (Id. at 34-35).

In Popham's case, a memo from HR to the Board in advance of the October meeting explicitly addressed retaliation concerns.  (See Abraham Dep. Ex. 7). The memo noted that "Human Resources has never retaliated against an employee for speaking at a Board meeting," that HR does not even check the public comment sign in sheet from Board meetings, and that HR itself does not make termination recommendations – the employees' respective supervisors do.  (Id. at 1).  The memo further addressed two previous termination decisions against employees who had spoken before the Board and listed the reasons those employees were terminated under the progressive discipline policy.  (Id.)  The memo also stated that in the first ten months of 2009 the District had disciplined 208 of its over 15,500 employees, and

only two of those 208 employees had spoken out at Board meetings.  (Id. at 2).  With respect to Popham, the memo states that Popham's progressive disciplinary events dated back to January 28, 2009, when he was suspended for falsifying his time card. The memo notes that this infraction was prior to Popham making public statements before the Board.  It states that Popham was "recommended for termination now as a result of being personally caught by the Executive Director of Transportation while asleep on duty in his idling bus; in addition to being asleep on duty while being paid as a standby driver, the employee had previously been directed not to park in that private business parking lot."  (Id. at 2).

This evidence indicates that the Board did not merely rubber stamp termination decisions.  Instead, it shows that the Board was aware of retaliatory concerns and had information showing that termination recommendations were not based on retaliatory motives.  Further, the Defendant has shown that the Board has rejected termination recommendations in the past.  (See Adams Dep. at 37-38).  In sum, the Plaintiff has not established that there was a custom or practice by which the Board failed to conduct meaningful review of termination recommendations or that the Board tacitly approved the unconstitutional actions of subordinate employees.  See Brooks, 813 F.2d at 1193.  Therefore, any retaliatory motivation of subordinate employees, such as Transportation Director Rick Grisham, is not attributed to the District.

Accordingly, the Plaintiff must show that a majority of the Board approved his termination in retaliation for protected speech.  The Plaintiff has not produced any evidence that the Board had a policy of retaliating against employees who exercised the right to speak at Board meetings.  "Even in the absence of an express policy or custom, a local government body can be held liable 'for a single act or decision of a policymaking authority in the area of the act or decision.'"  Cuesta v. School Board of Miami-Dade County, Fla., 285 F.3d 962, 968 (11th Cir. 2002) (quoting McMillian v. Johnson, 88 F.3d 1573, 1577 (11th Cir. 1996)).  "A policymaker's approval of an unconstitutional action can constitute unconstitutional [] policy only when the policymaker approves a subordinate's decision *and the basis for it*."  Matthews v. Columbia County, 294 F.3d 1294, 1297-98 (11th Cir. 2002) (quoting Gattis v. Brice, 136 F.3d 724, 727 (11th Cir. 1998)).  Here, the Board took explicit steps to satisfy itself that reprisal for public speaking was *not* the basis for the recommendations to terminate Popham.  Board member Abraham testified that Board members had previously been concerned that termination recommendations might be based on retaliatory motives, and sought assurances that that was not the case.  (Abraham Dep. at 40-42).  Additionally, the Board had ample evidence of the Plaintiff's poor job performance.  (See Abraham Dep. Ex. 7).  And further, there is no indication that any Board member was motivated to terminate the Plaintiff for his protected conduct.

In <u>Matthews</u>, the county defendant appealed following a jury verdict in favor of the plaintiff on section 1983 liability.  The jury's special verdict concluded that one commissioner on the county's board of commissioners was motivated by the plaintiff's protected speech activity in approving the determination to terminate the plaintiff as part of a broad reduction in force.  The verdict further found that two other commissioners on the five commissioner board were influenced by the first commissioner's improper motivation.   Only these three of the five total commissioners voted to terminate the plaintiff.  On appeal, the court reversed the trial court's denial of a judgment as a matter of law for the defendant following the jury verdict.  The court concluded that the facts did not establish municipal liability through a delegation or ratification theory.  With respect to a ratification theory, the court held that "[c]ounty liability on the basis of ratification exists when a subordinate public official makes an unconstitutional decision and when that decision is then adopted by someone who does have final policymaking authority."  <u>Id.</u> at 1297 (quoting <u>Bannum, Inc. v. City of Fort Lauderdale</u>, 901 F.2d 989, 998 (11th Cir. 1990)).  The court concluded that the fact that two of the commissioners may have known about or been influenced by the third commissioners unconstitutional motivations was insufficient itself to support a ratification theory.  The court reasoned that such a rule would hamper lawmakers who are aware of unconstitutional animus

behind legislation but who nevertheless support the legislation on other grounds. "Because only [one commissioner] was actually motivated by unconstitutional consideration, the County cannot be held liable under Section 1983."  Id. at 1298 (quoting Mason v. Village of El Portal, 240 F.3d 1337, 1340 (11th Cir. 2001)).

Here, in contrast, the evidence does not show that a single Board member was motivated to terminate Popham  for any protected activity.  Indeed, several Board members were unaware that the Plaintiff had previously spoken before the Board. (See Crowder-Eagle Dep. at 77; Crooks Dep. at 65; Banks Dep. at 16; Morgan Dep. at 28).  Board member Cash specifically stated she did not vote to terminate Popham because of his public comments or his participation in an employee organization.  (See Cash Dep. at 76-77).  Board member Bartlett also voted to terminate Popham due to his poor job performance.  (Bartlett Dep. at 34-35). Under Matthews, even if a Board member admitted that he or she was motivated to terminate Popham because of his protected activity, section 1983 liability would still not attach to CCSD unless additional Board members shared that animus.  See also Mason, 240 F.3d at 1340 (regarding the plaintiff's section 1983 retaliation claim, "there can be no municipal liability unless all three members of the council who voted against reappointing Plaintiff shared the illegal motive.").  Accordingly, the Plaintiff cannot establish

municipal liability and the Defendant's motion for summary judgment should be granted.

     B.    <u>The Plaintiff's Protected Activity</u>

Even if the Plaintiff could establish liability under <u>Monell</u>, the Defendant has provided ample evidence that the Plaintiff would have been terminated even in the absence of his protected activity.  In general,

> [f]or a public employee to sustain a claim of retaliation for protected speech under the First Amendment, the employee must show by a preponderance of the evidence these things: (1) the employee's speech is on a matter of public concern; (2) the employee's First Amendment interest in engaging in the speech outweighs the employer's interest in prohibiting the speech to promote the efficiency of the public services it performs through its employees; and (3) the employee's speech played a "substantial part" in the employer's decision to demote or discharge the employee. Once the employee succeeds in showing the preceding factors, the burden then shifts to the employer to show, by a preponderance of the evidence, that "it would have reached the same decision ... even in the absence of the protected conduct."

<u>Battle v. Board of Regents for Georgia</u>, 468 F.3d 755, 759-60 (11th Cir. 2006) (citing <u>Anderson v. Burke County, Georgia</u>, 239 F.3d 1216, 1219 (11th Cir. 2001)).  "In cases where a plaintiff has shown a public employer acted under both lawful and unlawful motives, the public employer cannot be liable if the evidence shows the public employer would have arrived at the same employment decision even in the absence of the allegedly protected activity."  <u>Boldin v. Limestone County</u>, 152 Fed. Appx. 841, 846 (11th Cir. 2005) (citing <u>Mt. Healthy</u>, 429 U.S. at 287).   Further,

"[t]he Supreme Court has made clear that even if the Defendant's animosity toward the [plaintiff's protected activity] played a 'substantial part' in the [Plaintiff's termination decision], such animosity cannot salvage the job of an employee who could have been fired anyway." Douglas v. DeKalb County, Georgia, No. 1:06-cv-0584-TWT, 2007 WL 4373970, at *4 (N.D. Ga. Dec. 11, 2007) (citing Mt. Healthy v. Doyle, 429 U.S. 274, 286 (1977)). The Plaintiff "may not use [his protected] activities to provide a cloak of immunity" for poor job performance. Id. at *3. Accordingly, "[w]ading through the muck of swirling allegations is unnecessary, as the Defendant[] need only advance one reason as to why [it was] justified in terminating the Plaintiff." Id. at *4 (citing Mt. Healthy, 429 U.S. at 286); see also Pennington v. City of Huntsville, 261 F.3d 1262, 1269 (11th Cir. 2001) ("In … § 1983 lawsuits, the Supreme Court has recognized that an employer can avoid liability if it can prove that it would have made the same disputed employment decision in the absence of the alleged bias.").

Here, assuming that the Plaintiff did in fact engage in protected conduct, the Defendant has provided numerous reasons for the Plaintiff's termination sufficient to satisfy the Mt. Healthy standard. On January 26, 2009, the Plaintiff was suspended for two days after he falsified his time card, which is itself a terminable offense. (Popham Dep. Ex. 5; Finlayson Dep. Vol. II, at 198-99). On April 21, 2009, the

Plaintiff was disciplined for arriving late to work.  (<u>Id.</u> Ex. 6).  On September 9, 2009, the Plaintiff parked his bus in the Rite-Aid parking lot.  (<u>See</u> Def.'s Statement of Material Facts, Ex. AA).  The Plaintiff was apparently informed on several occasions not to park in the Rite-Aid parking lot – the handbook he received as a driver did not list the Rite-Aid as an approved parking location (Def.'s Statement of Material Facts, Ex. J., at 80), Popham's supervisor told him not to park at the Rite-Aid at a September 2009 meeting (Rowe Dep. 147-48), the Plaintiff himself mentioned the restriction at a September 25, 2009, meeting (Popham Dep. at 115-16), and on October 13, 2009, Grisham circulated a memo instructing bus drivers not to park in single-business parking lots (Popham Dep. Ex. 7, at 1) -- but the Plaintiff was spotted parked there for a second time on October 19, 2009.  (Popham Dep. at 90-93).  After finding him at the wheel with his head down and believing him to be asleep, Grisham informed Rowe, Popham's supervisor.  (Rowe Dep. at 133, 144).  Soon after, the Plaintiff met with Peggy Baxter, who sought to review the videotapes that were supposed to be recording on the Plaintiff's bus.  The Plaintiff admitted in that meeting that he did not have a tape in the VCR at the time that Grisham discovered him.  (Popham Dep. at 98-100).  Drivers are required to record on their VCR at all times with a different tape each day, and although Popham claimed his VCR had been broken, he never submitted a written request for repair.  (<u>Id.</u> at 98-105).  He also testified that he only

had one tape for his VCR despite the requirement to use a different tape daily.  (Id.)
Baxter, however, found four video tapes on Popham's bus.  (Id. at 105).  Thereafter
HR instituted an investigation of Popham.   On October 21, the Plaintiff was
summoned to an HR meeting where he was informed that an investigation into his
employment was complete and that HR would be recommending his termination.
(See Def.'s Statement of Material Facts, Ex. AA).  In 2008 and 2009, five additional
employees, none of whom participated in public speaking activities, were terminated
for parking in undesignated areas.  (See Finlayson Aff. ¶ 4).  The Plaintiff was given
an opportunity to resign prior to the Board review but declined to and, on October 22,
2009, the Board approved the decision to terminate the Plaintiff.   (See Def.'s
Statement of Material Facts, Ex. AA at 2).

Based on the above evidence, the Board had sufficient reason to terminate the
Plaintiff without regard to his allegedly protected activities.  The District's progressive
discipline policy allows for termination following successive violations, and the
evidence shows that Popham violated several District policies, including
impermissibly parking his school bus at the same location two separate times.  Even
if the Plaintiff had shown that the recommendation for his termination was based in
part on unconstitutional motives, the Defendant has provided evidence to show that,
based on his job performance history, the Plaintiff would have been terminated

anyway.  See Douglas, 2007 WL 4373970, at *4 (noting that Mt. Healthy cautions against elevating employees to a better position than they would have been in "simply because they engaged in constitutionally protected conduct"); Mt. Healthy, 429 U.S. at 286 ("A borderline or marginal candidate… ought not to be able, by engaging in [protected conduct], to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.").  Accordingly, the Defendant's motion for summary judgment should be granted. [2]

## IV.  Conclusion

For the reasons set forth above, the Defendant's motion for summary judgment [Doc. 126] is GRANTED.

---

[2] Because the Court concludes that the Plaintiff cannot establish municipal liability and cannot overcome the Defendant's Mt. Healthy argument, the Court need not address whether the Plaintiff's speaking before the Board was protected conduct.

SO ORDERED, this 7 day of August, 2013.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge